COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Ortiz and Friedman
Argued at Fredericksburg, Virginia

DAVID VERNON BARRETT

MEMORANDUM OPINION[*] BY
v.      Record No. 1061-24-4      JUDGE DANIEL E. ORTIZ
                                  SEPTEMBER 23, 2025

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
Michael E. Levy, Judge

Eric Weathers, Assistant Public Defender (Virginia Indigent Defense
Commission, on briefs), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a jury trial, the trial court convicted David Vernon Barrett for sexual battery and

indecent liberties with a child under the age of 15. The trial court sentenced Barrett to 5 years and

12 months of incarceration, with 3 years and 10 months suspended. On appeal, Barrett contends

that the trial court erred in allowing the Commonwealth to reopen its case to admit additional

evidence, challenges the sufficiency of the evidence to sustain his convictions, and asserts that the

trial court erred in refusing his proposed jury instruction on lascivious intent. Finding no error, we

affirm the trial court's judgment.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

In 2018 and 2019, T.K. and K.L lived with their mother, Katherine Kennedy, and Barrett at a home in Stafford County. At that time, Barrett and Kennedy were in a long-term romantic relationship.[2]

On a day when Barrett's teenage son was visiting, T.K., who was fifteen years old, Barrett, and his son were swimming in the pool behind the house. Barrett and T.K. played a game, as they had before, that involved him throwing her in the pool. At some point, Barrett's son went inside the house to change the battery in his speaker. While he was gone, Barrett and T.K. continued with their game in the pool. With Barrett "cradling" T.K. in his arms in the water, Barrett slid his right hand down her back and touched her buttocks. Barrett then moved his hand toward her vagina. Barrett touching T.K. in this manner had never been a part of their pool game, and T.K. was not "okay" with it. Uncomfortable with the way Barrett was touching her, T.K. tried to push away from him. Barrett released T.K. when his son came back outside. T.K. then got out of the pool and went to the adjacent deck to dry herself. After Barrett's son again went inside the house, Barrett swam to the edge of the pool closest to the deck. He asked T.K. if she ever masturbated. When she said no, Barrett said she should because it would "loosen [her] more since [she was] always so tense." T.K. then went inside the house to her bedroom. A few minutes after T.K. had changed her clothes, Barrett "put his head through

---

[1] "Consistent with the standard of review when a criminal appellant challenges the sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[2] Barrett and Kennedy were in a relationship for eight years.

[T.K.'s] bedroom door"; Barrett was wearing only underwear. T.K. communicated with her mother about what had happened. Afterward, Kennedy, T.K., and K.L. left the house to stay in a hotel.[3]

A separate incident between Barrett and K.L. occurred between 2018 and 2019, when she was in the seventh grade and 12 or 13 years old. Because there was only one bathroom in the home, they followed a "house rule" of asking if anyone needed to use the bathroom before taking a shower. During her seventh-grade year, and while home alone with Barrett, K.L. asked him if he needed to use the bathroom before she showered. Barrett said yes, so K.L. waited in her bedroom on her bed until he was finished. After visiting the bathroom, Barrett entered K.L.'s room, lifted her shirt, and rubbed her stomach with a circular motion. K.L. told Barrett to stop and pulled down her shirt, but he kept doing it anyway. Barrett eventually left the bedroom. When Barrett returned a few minutes later, he was not wearing a shirt, his pajama pants were unbuttoned, and "his penis was out." Barrett stood in the door frame of the bedroom, about ten feet from K.L. K.L. saw "the whole penis."

While she was in the shower later, K.L. heard the sound of the doorknob moving, as if someone were trying to open the locked bathroom door, and she also heard someone pacing outside the bathroom door. Back in her bedroom after her shower, K.L. heard scratching sounds outside her door. She thought it might be her dogs, but she was frightened from the earlier events and checked "under the door." K.L. saw two men's shoes and a "black thing" resembling a curtain rod extended under the bedroom door. Unnerved, K.L. called her mother. K.L. then left the house and went to a parking lot located across the street to wait for her mother's return.

---

[3] T.K. testified that Barrett continued to live with her, Kennedy, and K.L. for a few years after the incident in the pool happened.

Kennedy confronted Barrett about K.L.'s accusation, but he denied that the incident happened. Kennedy also asked if something could have happened between him and T.K. Barrett said that he could not remember.

T.K. spoke to the police about the incident involving Barrett in April 2022, after he and Kennedy had ended their relationship. Detective Nicholas Ridings attempted to contact Barrett after Kennedy went to the police. Detective Ridings testified that he was never able to speak to Barrett about the incidents with T.K. and K.L. He stated that he left Barrett a voicemail and actually spoke to him on August 1, 2022. At that time, Barrett promised to call the detective back, but he never did. Detective Ridings left voicemail messages for Barrett asking for a return call on four days in August 2022, but Barrett did not call him. Finally, Detective Ridings spoke to Barrett by phone on August 23, 2022, but not about the facts of the case.

A Stafford County grand jury indicted Barrett for taking indecent liberties with K.L. and sexual battery of T.K.[4] On the day of trial but before jury selection, Barrett moved *in limine* to exclude Detective Ridings's testimony about his attempts to contact Barrett years after the incidents happened and how he had difficulty reaching Barrett, arguing that the testimony would implicate Barrett's constitutional right to remain silent. When the trial court asked if there would be any attempt to criticize the police investigation, Barrett said that it was not a part of the trial strategy. The trial court then granted Barrett's motion, "subject to reversal of that decision in the event that there is criticism of the investigation."

After Barrett moved to strike at the end of the Commonwealth's case in chief, but before the trial court ruled on the motion, the Commonwealth moved to reopen the case to permit Detective Ridings to testify about his efforts to contact Barrett. Citing *Pulley v. Commonwealth*,

---

[4] Both victims were juveniles at the time of the charged offenses. Upon the Commonwealth's motion, the trial court nolle prossed two other charges against Barrett involving K.L. and T.K.

31 Va. App. 600 (2000), the Commonwealth argued that Detective Ridings's testimony would not be an improper comment on Barrett's right to remain silent. Barrett argued that it was improper to permit the Commonwealth to reopen its case in the midst of the motion to strike. He further contended that the Commonwealth was seeking to avoid a conclusion by the jury that Detective Riding had not done a thorough investigation, but that issue was not within the jury's purview. Barrett argued that Detective Ridings's attempts to contact him were irrelevant to his guilt or innocence of the offenses, and the investigation itself had not been challenged on cross-examination of Detective Ridings. He maintained that he was not required to speak to the police and that to imply otherwise would violate his Fifth Amendment right to remain silent. The trial court granted the motion and ruled that the Commonwealth was permitted to recall the detective to provide the limited testimony described above about his efforts to contact Barrett, but not about the content of any interaction with Barrett. The court also denied Barrett's motion to strike.

The trial court then addressed jury instructions. The court granted the Commonwealth's instruction on the intent required for indecent liberties, which stated, "Lascivious means a state of mind that is eager for sexual indulgence, desirous of inciting to lust or of inciting sexual desire and appetite." This instruction is identical to Virginia Criminal Model Jury Instruction 29.200. The court also refused Barrett's proposed jury instruction on lascivious intent, which recited factors from *McKeon v. Commonwealth*, 211 Va. 24, 27 (1970).

After less than an hour of deliberation, the jury returned a guilty verdict for Barrett on both taking indecent liberties with K.L. and sexual battery of T.K. This appeal followed.

ANALYSIS

On appeal, Barrett assigns error to the trial court's reopening the evidence to allow additional direct examination of Detective Ridings, the sufficiency of the evidence to sustain

- 5 -

both of his convictions, and the court's refusal of his proposed jury instruction on lascivious intent.  We address each in turn.

## I.  Reopening the Evidence

This Court has found that the "reopening of a case" to permit "the admission of additional evidence after one or both parties have rested" is "within the discretion of the trial court[.]" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 568 (2018) (quoting *Fink v. Higgins Gas & Oil Co.*, 203 Va. 86, 89 (1961)).  Such an action "will not be reviewed unless it affirmatively appears that this discretion has been abused or unless the admission of such additional evidence works surprise or injustice to the other party."[5]  *Id.* (quoting *Fink*, 203 Va. at 89).

"The abuse of discretion standard, 'if nothing else, means that the trial judge's ruling will not be reversed simply because an appellate court disagrees.  Only when reasonable jurists could not differ can we say an abuse of discretion has occurred.'"  *Holloman v. Commonwealth*, 65 Va. App. 147, 158 (2015) (quoting *Tynes v. Commonwealth*, 49 Va. App. 17, 21 (2006)).  "This bell-shaped curve of reasonability governing our appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Commonwealth v. Barney*, 302 Va. 84, 94 (2023) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)).

Barrett's assignment of error states, "The trial court erred by reopening the case to admit evidence of the detective's calls" to him.  Barrett maintains that, "[b]ecause of the ambiguity

---

[5] Additionally, our Supreme Court has "recognized [the] authority of a court to reconsider an erroneous or flawed decision." *Commonwealth v. McBride*, 302 Va. 443, 449 (2023).  "The power to reconsider is often described as an inherent power of a court." *Id.*  "The power to decide carries with it the power to reconsider as a necessary adjunct." *Id.* at 449-50.  Thus, there is no question that the trial court had the authority to reconsider its ruling on the motion *in limine* excluding Detective Ridings's testimony about his attempts to contact Barrett.

inherent" in his silence, "the evidence introduced by the Commonwealth lacked meaningful probative value." He further asserts that any probative value of the detective's testimony was outweighed by unfair prejudice, relying on cases discussing post-*Miranda*-warning silence.

As an initial matter, there is no evidence in the record that Barrett was in custody when Detective Ridings called him or had invoked his right to remain silent at any point during Ridings's attempts to contact him. Barrett's reliance on caselaw discussing the prejudice inherent in referencing a defendant's post-*Miranda* silence is thus misplaced. *See Watts v. Commonwealth*, 38 Va. App. 206, 214 (2002) ("'*Miranda* warnings[]' are required only when a suspect is both in custody and subjected to interrogation . . . ." (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980))).

Even if Barrett had somehow invoked this right, due process is not compromised by a police officer's "mere mention that defendant had once invoked his right to counsel." *Pulley*, 31 Va. App. at 605. In *Doyle v. Ohio*, 426 U.S. 610, 618 (1976), the Supreme Court of the United States found that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." But "*Doyle* does not impose a prima facie bar against any mention whatsoever of a defendant's right to request counsel [or remain silent]." *Pulley*, 31 Va. App. at 604 (alteration in original) (quoting *Lindgren v. Lane*, 925 F.2d 198, 201, 202 (7th Cir. 1991)). It merely "guards against the exploitation of that constitutional right by the prosecutor." *Id.* (quoting *Lindgren*, 925 F.2d at 202). Here, the Commonwealth did not ask Detective Ridings if Barrett invoked his right to silence, and the officer did not testify as such. The limited testimony that the trial court permitted upon reopening the Commonwealth's case was that the detective had left several messages asking Barrett to return the call, but he did not. We find that this testimony did not

unfairly prejudice Barrett, and, accordingly, the trial court did not abuse its discretion in permitting the Commonwealth to reopen its case.

## II. Sufficiency

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)). The only relevant question for this Court on review is, "after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

In conducting our analysis, we are mindful that determining witness credibility "is within the exclusive province of the jury, which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). The jury "[i]s free to believe or disbelieve, in part or in whole, the testimony of any witness." *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (en banc). "When credibility issues have been resolved by the jury in

favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong." *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991)).

*Indecent Liberties against K.L.*

To prove Barrett's guilt of indecent liberties, the Commonwealth was required to prove that he "knowingly and intentionally" exposed his penis to K.L. "with lascivious intent." Code § 18.2-370(A)(1). Barrett maintains the evidence was insufficient to prove that he knowingly exposed his penis to the child with lascivious intent.

On whether the evidence was sufficient to show that Barrett acted knowingly, here, Barrett returned to K.L.'s bedroom after repeatedly touching her stomach in an unwanted and suggestive manner. When he returned, Barrett was not wearing a shirt, his pants were undone, and his penis was completely exposed while he stood at her bedroom door. K.L. saw Barrett's "whole penis," not just a portion of it, indicating that the fly of his pants was likely not opened inadvertently. Additionally, after this incident, K.L. went to shower and heard someone trying to turn the doorknob to the bathroom as well as pacing outside the bathroom door. When she returned to her bedroom, K.L. heard scratching at her door. She thought it might be her dogs, but after checking "under the door," she saw a pair of men's shoes and a "black thing going under the door [that] . . . looked kind of like a curtain rod." K.L. and Barrett were the only people in the home at that time. These facts and circumstances, taken in the light most favorable to the Commonwealth, amply support the conclusion that Barrett knowingly and intentionally exposed his penis to K.L. when he stood in her doorway.

Turning to whether the evidence was sufficient to demonstrate lascivious intent, our Supreme Court has defined "lascivious intent" as describing "a state of mind that is eager for sexual indulgence, desirous of inciting to lust or of inciting sexual desire and appetite." *Dietz v.*

*Commonwealth*, 294 Va. 123, 136 (2017) (quoting *Viney v. Commonwealth*, 269 Va. 296, 299 (2005)). "Intent is a factual determination, and a [fact-finder]'s decision on the question of intent is accorded great deference on appeal and will not be reversed unless clearly erroneous." *Towler*, 59 Va. App. at 297. "It is permissible for the fact finder to infer that every person intends the natural, probable consequences of his or her actions." *Ellis v. Commonwealth*, 281 Va. 499, 507 (2011). "Intent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from [it]." *Summerlin v. Commonwealth*, 37 Va. App. 288, 297 (2002) (quoting *Fleming v. Commonwealth*, 13 Va. App. 349, 353 (1991)).

Here, Barrett entered K.L.'s bedroom and touched her on her stomach, and he continued even after she pulled down her shirt and told him to stop. When he returned and stood in her bedroom doorway later, he was not wearing a shirt and his penis was exposed. While she was vulnerable and naked in the shower, K.L. heard the doorknob move, as if Barrett was trying to enter the locked bathroom. Barrett's behavior, involving both unwanted touching and plain exposure of his genitalia, strongly supports the inference that he exposed his penis to K.L. with "a state of mind that [wa]s eager for sexual indulgence." *Dietz*, 294 Va. at 136. Thus, the jury did not clearly err in determining that Barrett acted with lascivious intent, and we affirm Barrett's conviction.

*Sexual Battery*

Under Code § 18.2-67.4(A)(i), a person is guilty of sexual battery if he sexually abuses the victim "against the will of the complaining witness, by force, threat, intimidation, or ruse . . . ." "Sexual abuse" is defined, in part, as an act committed when "[t]he accused intentionally touches the complaining witness's intimate parts or material directly covering such intimate parts[.]" Code § 18.2-67.10(6)(a). "Intimate parts" includes the "buttocks." Code

§ 18.2-67.10(2). Barrett contends that the evidence was insufficient to prove that the offensive touching of T.K. was intentional and accomplished by force, threat, intimidation, or ruse.

First, Barrett's words and actions, taken in the light most favorable to the Commonwealth, support the conclusion that Barrett touched T.K.'s intimate parts intentionally. Taking advantage of his son's absence at the pool area, Barrett slid his hand down T.K.'s back and touched her buttocks. Then, he moved his hand toward her vagina before T.K. was able to push away from Barrett after his son returned. Barrett then questioned T.K. about whether she masturbated, suggesting that his prior touching was not merely accidental but had been an intentional touching of T.K.'s intimate parts.

Second, the Commonwealth's theory at trial was that Barrett accomplished this sexual abuse by "ruse," rather than by "force, threat, [or] intimidation." Code § 18.2-67.4(A)(i). The Code does not define "ruse," but this Court may consult dictionary definitions to ascertain the term's ordinary meaning. *See Eley v. Commonwealth*, 70 Va. App. 158, 165 (2019); *Smith v. Commonwealth*, 72 Va. App. 523, 533-34 (2020). A ruse is defined as "a stratagem or trick usually intended to deceive" and "a wily subterfuge." *Ruse*, *Webster's Third New International Dictionary* (1981); *accord Ruse*, *American Heritage Dictionary of the English Language* (5th ed. 2011).

Here, Barrett waited until his son went inside the house to commence touching T.K, and he did so in the midst of a game that he and T.K. had played before in which he would throw her into the pool. When Barrett moved his hand toward T.K.'s vagina, T.K. immediately tried to push away from Barrett, but she only succeeded after Barrett's son returned outside. Then, after Barrett's son again went back inside, Barrett went up to T.K. and asked whether she masturbated. These circumstances strongly suggest that Barrett behaved opportunistically, waiting for him and T.K. to be alone before acting, and that he used the guise of a pool game as

- 11 -

"a stratagem" to touch T.K. Thus, applying the term's plain meaning, the evidence supported the Commonwealth's theory that Barrett accomplished this sexual abuse by "ruse," and we accordingly affirm Barrett's conviction for sexual battery.

### III. Refused Jury Instruction

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Conley v. Commonwealth*, 74 Va. App. 658, 674-75 (2022) (quoting *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019)). We review a trial court's decisions in giving and denying requested jury instructions for abuse of discretion. *Id.* at 675. But "whether a jury instruction accurately states the relevant law is a question of law that we review de novo." *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)). Additionally, "[i]f the principles set forth in a proposed instruction are fully and fairly covered in other instructions that have been granted, a trial court does not abuse its discretion in refusing to grant a repetitious instruction." *Fahringer*, 70 Va. App. at 211 (quoting *Joseph v. Commonwealth*, 249 Va. 78, 90 (1995)).

The trial court's instruction on lascivious intent read, "Lascivious means a state of mind that is eager for sexual indulgence, desirous of inciting to lust or of inciting sexual desire or appetite"—a correct statement of Virginia law. *Cf. Dietz*, 294 Va. at 136. Barrett nonetheless argues that the trial court erred in denying his proposed jury instruction on lascivious intent, which expressly stated the factors articulated in *McKeon v. Commonwealth*, 211 Va. 24 (1970). Those are: (1) whether the defendant was sexually aroused; (2) whether the defendant made sexual gestures toward himself or to the child; (3) whether the defendant made improper remarks to the child; or (4) whether the defendant asked the child to do something wrong. *Id.* at 27.

In *Mason v. Commonwealth*, 49 Va. App. 39, 50 (2006), the trial court instructed the jury on lascivious intent precisely as the court did here and refused an instruction detailing the four *McKeon* factors. *Id.* at 48-49. We emphasized that "the [Supreme] Court has not held that proof of one of the four factors is a prerequisite to a finding of lascivious intent" and found that the trial court did not err in its instruction to the jury. *Id.* at 50. We further observed that "Virginia courts have often cautioned against lifting the 'language of a specific opinion' for a jury instruction given that an appellate opinion 'is meant to provide a rationale for a decision—and may not translate immutably into jury instructions.'" *Id.* at 49 (quoting *Seaton v. Commonwealth*, 42 Va. App. 739, 753 (2004)).

Here, just as in *Mason*, we find that language from *McKeon* was unnecessary for the jury's proper instruction. Given that we have expressly held that the *McKeon* factors are not a "prerequisite to a finding of lascivious intent," *Mason*, 49 Va. App. at 50, the court "fully and fairly covered" the relevant law by giving only the one, *Fahringer*, 70 Va. App. at 21. Thus, the court did not abuse its discretion by rejecting an instruction "lift[ed from] 'the language of a specific opinion,'" *Mason*, 49 Va. App. at 49, and we affirm its judgment.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*